No. 50,551

MOBIL OIL CORPORATION, *Appellant,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS; G. T. VAN BEBBER, Chairman; WILLIAM G. GRAY and R. C. LOUX, Commissioners, and their respective successors in office, as Members of the State Corporation Commission of the State of Kansas, and ALFRED M. BRECHEISEN, CLARENCE W. BRECHEISEN ESTATE, JESSIE MARIE FAGAN, CHARLES PAUL BRECHEISEN, HENRY RAYMOND BRECHEISEN, JAMES MARVIN BRECHEISEN, FRED HINCH, DOROTHY E. HINCH, GEORGE L. HINCH, HELEN J. HINCH, CHARLES F. HINCH and MARSHA J. HINCH, Intervenors, *Appellees.*

(608 P.2d 1325)

Opinion filed April 5, 1980.

*Richard Jones,* of Hershberger, Patterson, Jones & Roth, of Wichita, argued the cause, and *Landon T. Carlson,* of Mobil Oil Corporation, of Denver, and *Paul A. Wolf,* of Brollier, Wolf & Johnson, of Hugoton, were with him on the brief for the appellant.

*LuAnn C. Dixon,* assistant general counsel for the State Corporation Commission, argued the cause and was on the brief for the appellee, State Corporation Commission.

*Dale M. Stucky,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause, and *Mark E. Singer,* of the same firm, was with him on the brief for the appellees, Alfred M. Brecheisen, *et al.*

The opinion of the court was delivered by

MCFARLAND, J.: Mobil Oil Corporation filed an application with the State Corporation Commission for the assignment of an allowable at the appropriate time and for a noncontiguous acreage attribution exception for a well to be drilled in the

Panoma Council Grove Gas Field in Stevens County, Kansas. The proposed unit consisted of three 160-acre tracts and a 4/7 undivided interest in a fourth 160-acre tract. The State Corporation Commission granted the application as to the first three tracts, but denied the application as to the fourth tract on the ground of lack of jurisdiction. Mobil appealed the order to the district court of Stevens County. The district court upheld the State Corporation Commission and Mobil brings this appeal. The intervenors in this action are the owners of the undivided 3/7 mineral interest in the excluded tract.

The question before us is one of first impression and is whether or not the State Corporation Commission (hereinafter referred to as "Commission") has jurisdiction to consider a fractional undivided mineral interest for inclusion in a noncontiguous acreage exception for a gas well. The Commission concluded that it lacked jurisdiction herein by virtue of the fact that inclusion of the 4/7 undivided interest in the unit could have the possible effect of forcing unitization on the owners of the remaining 3/7 undivided interest. All parties agree that the Production and Conservation of Natural Gas Act (K.S.A. 55-701 *et seq.*) confers no powers to the Commission by which it could compel unitization.

Mobil leased the entire 160-acre tract in dispute in 1929. The lease did not contain a unitization clause. Mobil sought to form a production unit of the four tracts in the Panoma Council Grove Field. The owners of the mineral rights in three tracts consented, as did the owners of the 4/7 undivided mineral interest in the fourth tract. The owners of the 3/7 undivided interest in the fourth tract did not consent. Therefore, the application filed by Mobil with the Commission was for a proposed unit of 571 acres (160+160+160+91). The proposed unit was to be open-ended in order that the remaining 69 acres could join at a later time if the owners desired.

In order to understand the rationale of the Commission, it is necessary to include herein a major portion of its order of May 19, 1977, as follows:

ORDER OF THE COMMISSION

"1.   K.S.A. 55-701 prohibits the production of natural gas in the State of Kansas when such production may only be accomplished in a manner or under a condition or for such purposes which may constitute waste. K.S.A. 55-703 permits the State Corporation Commission to exercise its jurisdiction whenever it determines that the orderly development of, and production of gas from, any common

source of supply requires such exercise. In addition, the Commission may promulgate production regulations if the available production of natural gas from a common source of supply is in excess of the market demand for gas from that supply.

"2. In its Revised Basic Proration Order for the Panoma Council Grove Gas Pool, Docket No. 60,024-C (C-7058), the Commission concluded that one common source of supply existed in the Council Grove Formation of the lower Permian system. This is the producing formation which is the subject of the present application.

"3. K.A.R. 82-2-207 in the Commission's General Rules and Regulations for the Conservation of Crude Oil and Natural Gas sets forth those items which are to be included in an application for an allowable to a gas well in a prorated pool. One such item is the exact location of the well and acreage which is to be attributed to the well.

"4. The Applicant has filed an application with the Commission requesting that an allowable be assigned to its G. W. Shell Unit No. 1 Well in the Panoma Council Grove Gas Field. The Applicant has further requested relief from the contiguous acreage attribution requirements contained in the Revised Basic Proration Order for the Field. . . .

. . . .

"7. Applicant's G. W. Shell Unit No. 1 Well is to be located approximately 1321 feet from the north line and 1320 feet from the east line of Section 29, Township 34 South, Range 38 West, Stevens County, Kansas.

"8. The Applicant seeks to attribute the following described acreage to its G. W. Shell No. 1 Well:

Northeast Quarter (NE/4) of Section 29; an undivided 4/7 interest in the Northeast Quarter (NE/4) of Section 31; and Southwest Quarter (SW/4) of Section 32, Township 34 South, Range 38 West; and the Southeast Quarter (SE/4) of Section 6, Township 35 South, Range 38 West, all in Stevens County, Kansas.

"9. The acreage described in Finding (8) contains 571 acres, more or less. The leases which Applicant holds covering Sections 32, 31 and 6 in the acreage sought to be attributed to the Shell Well do not contain the right of unitizing those leases with others for the purpose of forming a production unit. A unitization agreement allowing the acreage described in Finding (8) to be formed as a gas producing unit has been agreed to by all royalty owners therein except for the Northeast Quarter (NE/4) of Section 31, Township 34 South, Range 38 West, Stevens County, Kansas. The Applicant has obtained the approval of the unitization agreement from those who own an undivided interest in 4/7 of the royalties from production on that particular quarter section. The 3/7 royalty interest owners in that quarter section who have not consented to the unitization agreement with the Applicant appeared at the public hearing in this matter in order to make their objection to the application known. These 3/7 royalty owners further contend that the Commission lacks the authority to compel the unitization of noncontiguous acreage for purposes of attributing land to a gas well where there has been no voluntary agreement to such unitization by the royalty owners.

"10. The Commission is able to regulate only in a manner prescribed by this state's legislature. The statutory directives in Article 7 of the Kansas Statutes

Annotated are primarily aimed at preventing waste and protecting the correlative rights of those with interests in the production of natural gas in the state. At no point in the gas conservation statutes is the Commission able to require the compulsory formation of a production unit without the consent of those with interests in the royalties. Even though the formation of a production unit of separate tracts in the Panoma Council Grove Field may be desirable for the prevention of waste and the protection of correlative rights, the authority to require it may not be implied from the gas conservation statutes. As a result, the Commission is without jurisdiction to approve the attribution of an undivided 4/7 interest of the Northeast Quarter (NE/4) of Section 31, to the G. W. Shell No. 1 Well.

"It is clear that the Applicant would not be able to produce gas from only 4/7 of that acreage. Rather, the Applicant would be taking gas from the entire quarter section. Thus, attributing the undivided 4/7 interest would either have an effect similar to a partitioning of the interests in this property, or violate the rights of those with the remaining undivided 3/7 interests in the quarter section, and thus possibly compel them to join in the unit. The Commission is unable to bring about either of these results.

"11. There are producing gas wells into the Hugoton pay zones in each of the quarter sections listed in Finding (8), with the exception of the Northeast Quarter of Section 29. A Hugoton well in the NE/4 of Section 31 has that 160 acres attributed thereto, one in the Southeast Quarter of Section 6 has attributed to it that 160 acres, and the Hugoton well in the Southwest Quarter (SW/4) of Section 32 has 320 attributable acres. Therefore, the G. W. Shell No. 1 Well will not be located on an existing noncontiguous unit to which a Hugoton allowable has been granted.

"12. A present and future market for the gas exists because the gas to be produced from Applicant's G. W. Shell No. 1 Well will be sold to Northern Natural Gas Company at a price of $0.52 per Mcf at 14.65 pounds per square inch absolute pressure base. Utilization of the gas from the G. W. Shell No. 1 Well is for a purpose permitted by the laws of Kansas and the rules and regulations of this Commission. Furthermore, such utilization does not constitute waste.

"13. The Revised Basic Proration Order for the Panoma Council Grove Gas Pool, as amended, provides for the granting of exceptions to the contiguous acreage provisions of said Order whenever:

"1. The granting of such exception is necessary to prevent waste and to protect correlative rights; and
"2. A reasonable attempt has been made to include the acreage sought to be attributed in contiguous units; and
"3. All acreage concerned is proven to be reasonably comparable in the Council Grove Pay Formation.

"Furthermore, all acreage attributed to a well must be productive of gas.

"14. The following described acreage is the closest acreage available for the formation of the unit when the existing Hugoton units and the Applicant's plans for development are considered:

The Northeast Quarter of Section 29 and the Southwest Quarter of Section 32, Township 34 South, Range 38 West, and the Southeast Quarter of Section 6, Township 35 South, Range 38 West, all in Stevens County, Kansas.

"In addition, geological testimony indicated that the three quarter sections described in this Finding are reasonably comparable in productive capabilities, and that all three quarter sections are productive of gas. Furthermore, the Commission finds that granting the noncontiguous acreage exception for the said three quarter sections will prevent waste and protect correlative rights.

"15. The application should be granted to the extent discussed herein.

"IT IS, THEREFORE, BY THE COMMISSION ORDERED: That the application of Mobil Oil Corporation for the assignment of an allowable and a noncontiguous acreage attribution exception for a well to be drilled in the Panoma Council Grove Gas Field, Stevens County, Kansas, be granted in part and denied in part; that there be an exception to the contiguous or adjoining acreage provision of the Revised Basic Proration Order for the Panoma Council Grove Gas Field and the acreage described in Finding (14) is hereby attributed to the Applicant's G. W. Shell Unit No. 1 Well; and upon the filing of an acreage and attribution certificate with the Conservation Division, 245 N. Water, Wichita, Kansas, an appropriate gas allowable be assigned thereto.

"This order shall become effective forthwith, and said allowable shall be assigned to said well upon said date, or upon the date of the beginning of the deliverability test, or upon the date of the filing of the certificate of the acreage plat, whichever date is later."

In its order of July 8, 1977, relative to Mobil's application for reconsideration, the Commission stated:

"1. The Commission is unable to act in a manner which would, in essence, partition the interests in the Northeast Quarter (NE/4) of Section 31, Township 34 South, Range 38 West, Stevens County, Kansas. A party cannot accomplish through this requested administrative action what should be sought through the courts of the state.

"2. The Commission's Order in this docket dated May 19, 1977, is based upon substantial competent evidence. The record, all pleadings and briefs have been thoroughly reviewed, in addition to a reassessment of the Commission's duties and jurisdiction under K.S.A. 55-701 *et seq.* The responsibility of the Commission is to weigh the evidence and determine its credibility while giving all due regard to its authority. This process having occurred in the instant docket, we conclude that the Order of May 19, 1977, is reasonable.

"3. The Order dated May 19, 1977, complies with the applicable provisions of K.S.A. 55-701 *et seq.,* in addition to the rules and regulations of the Commission.

"4. As a result of Finding (3) above we conclude that the Order dated May 19, 1977, is lawful.

"5. The Order dated May 19, 1977, should be affirmed."

Further insight into the rationale of the Commission's determination that it lacked jurisdiction to consider inclusion of the 4/7 interest in a unit is found in its brief, wherein it states:

"Mobil argues that if the Intervenors (nonconsenting owners) are dissatisfied with the attribution of part of their undivided interest, their remedy is in a court of law. It seems inconsistent that Appellant should accuse the Intervenors of misus-

ing the Commission forum while Appellant is eager to use a Commission decision to partition an undivided interest in land and gain an unfair bargaining advantage, all in the name of preventing waste and protecting correlative rights.

"Appellant speaks a great deal about protecting the correlative rights of the consenting 4/7 owners but no mention is made of protecting those of 3/7 nonconsenting owners. If the Commission *approves* the attribution of the 4/7 undivided interest, the correlative rights of the 3/7 would be effectively denied. They would be required to join the unit under Mobil's terms, or sue for enforcement of their lease rights, or lose their share in the Panoma Council Grove production. However the Commission's *denial* of the attribution does not alter the correlative rights of any owner. The consenting and nonconsenting owners are left in the same position as before the application. Then Mobil must either renegotiate with them on balanced terms or one of the owners must petition a court for partition.

"Instead of taking any action that would alter the bargaining positions of the parties, the Commission in its discretion chose to leave everyone with the remedies available before the application was filed. In support of this idea, Appellee would point out Commission's findings in the second paragraph of paragraph 10 of its May 19, 1977, order:

"It is clear that the Applicant would not be able to produce gas from only 4/7 of that acreage. Rather the Applicant would be taking gas from the entire quarter section. Thus, attributing the undivided 4/7 interest would either have an effect similar to a partitioning of the interests in this property, or violate the rights of those with the remaining undivided 3/7 interests in the quarter section, and thus possibly compel them to join in the unit. The Commission is unable to bring about either of these results.

"The Commission based its findings on substantial, competent evidence and its decision should not be reversed."

The district court heard Mobil's appeal and made the following findings of fact and conclusions of law:

ORDER OF THE DISTRICT COURT

"This appeal from an order of the Kansas Corporation Commission allowing a 480-acre noncontiguous unit for Panoma Council Grove production but denying the attribution of the NE ¼ 31-34-38 in Stevens County, Kansas, arises because the lease on the described quarter section was executed November 30, 1929, and did not anticipate or include the right of lessee to pool said quarter section for purposes of unitized production. The owners of 4/7 interest in the minerals consented to the proposed unit and the remaining owners of the remaining undivided 3/7 did not agree. (The owners of an undivided 1/14 interest later asserted a revocation of their consent but the parties involved agree that a determination of the effect of the revocation is not necessary to a decision determining the validity of the order appealed.)

"Plaintiff in this action, Mobil Oil Corporation, contends that the K.C.C. erred in denying attribution of the 4/7 undivided interest in said 160 acres because said order fails to protect the correlative rights of the owners of said interest and also denies the rights of plaintiff to prevent waste by having an allowable for the largest possible production unit. (Production allowance is set in this field on a combination of attributed acreage and deliverability of the well itself.)

"The Commission and intervenors (owners of the nonconsenting interest) contend that to allow the attribution would be to grant Plaintiff a right it did not acquire in the original lease, would be tantamount to compulsory unitization, and would be in effect allowing the K.C.C. to grant partition to the owners which is an exclusive function of the courts.

"The issue presented appears to be one of first impression not only in Kansas but in any other state except perhaps those with compulsory unitization. However, the implications from *Republic Natural Gas Co. v. Baker,* 197 F.2d 647, clearly set forth the position of the nonconsenting owners herein.

"The Court finds the reasoning of the K.C.C. persuasive and adopts the briefs herein filed by the Defendant Commission as its legal conclusions herein. Thus, the Court finds that subsequent interest owners cannot modify an existing lease on a tract by dedication of undivided interests to a producing unit absent the consent of all owners.

"The order of the Corporation Commission, appealed herein, is hereby affirmed."

We must bear in mind that the sole question before us is whether the Commission did or did not have jurisdiction to consider the application as it related to the 4/7 fractional undivided mineral interest. The merits as to whether the Commission should or should not have included it in the exception and granted an allowable thereon are not before us.

We must first examine the scope of the Commission's jurisdiction herein. The Commission is a creature of statute with limited jurisdiction and it possesses no powers not granted by statute. See *Bennett v. Corporation Commission,* 157 Kan. 589, 596, 142 P.2d 810 (1943).

The relevant statutes herein are contained in the Production and Conservation of Natural Gas Act as follows:

"55-701. **Waste of natural gas prohibited.** The production of natural gas in the state of Kansas in such manner and under such conditions and for such purposes as to constitute waste is hereby prohibited."

"55-702. **Definitions.** The term 'waste' as herein used, in addition to its ordinary meaning, shall include economic waste, underground waste and surface waste. Economic waste as used in this act, shall mean the use of natural gas in any manner or process except for efficient light, fuel, carbon black manufacturing and repressuring, or for chemical or other processes by which such gas is efficiently converted into a solid or a liquid substance. The term 'common source of supply' wherever used in this act, shall include that portion lying within this state of any gas reservoir lying partly within and partly without this state. The term 'commission' as used herein shall mean the state corporation commission of the state of Kansas, its successors, or such other commission or board as may hereafter be vested with jurisdiction over the subject matter of this act."

"55-703. **Production regulations; rules and formulas.** Whenever the available production of natural gas from any common source of supply is in excess of the

market demands for such gas from such common source of supply, or whenever the market demands for natural gas from any common source of supply can be fulfilled only by the production of natural gas therefrom under conditions constituting waste as herein defined, or whenever the commission finds and determines that the orderly development of, and production of natural gas from, any common source of supply requires the exercise of its jurisdiction, then any person, firm or corporation having the right to produce natural gas therefrom, may produce only such portion of all the natural gas that may be currently produced without waste and to satisfy the market demands, as will permit each developed lease to ultimately produce approximately the amount of gas underlying such developed lease and currently produce proportionately with other developed leases in said common source of supply without uncompensated cognizable drainage between separately-owned, developed leases or parts thereof.

"The commission shall so regulate the taking of natural gas from any and all such common sources of supply within this state as to prevent the inequitable or unfair taking from such common source of supply by any person, firm or corporation and to prevent unreasonable discrimination in favor of any one common source of supply as against another and in favor of or against any producer in any such common source of supply. In promulgating rules, regulations and formulas, to attain such results the commission shall give equitable consideration to acreage, pressure, open flow, porosity, permeability and thickness of pay, and such other factors, conditions and circumstances as may exist in the common source of supply under consideration at the time, as may be pertinent: *Provided, however,* That the daily takes of gas from any well in an unprorated gas pool shall not exceed twenty-five percent (25%) of its open flow: *Provided further, however,* That the provisions of this act shall not apply to any common source of supply in which the average open flow of all the producing wells therein is not in excess of seven hundred fifty thousand (750,000) cubic feet per day.

"The commission in determining the market demand for gas from a common source of supply shall consider the reasonable current requirements for current consumption and use within and without the state, and such other factors, conditions, or circumstances that would aid in establishing the market demand."

"**55-703a. Well spacing and orderly development.** The drilling and completion of a gas well shall not of itself entitle said well to an allowable for production; and the commission may, in its discretion, provide for well spacing in any such common source of supply and provide for the orderly development thereof."

"**55-704. Rules and regulations authorized; notice and hearings.** The commission shall promulgate such rules and regulations as may be necessary for the prevention of waste as defined by this act, the protection of all water, oil or gas-bearing strata encountered in any well drilled in such common source of supply, ascertaining the several factors entering into the determination of the productive capacity of each well, the total productive capacity of all wells in the common source of supply, the establishment of such other standard or standards as the commission may find proper to determine the productive capacity of each well and of all wells in such common source of supply, and as the commission may find necessary and proper to carry out the spirit and purpose of this act: *Provided, however,* That notice, as provided in K.S.A. 55-706, shall be served

upon or given to the producers and purchasers of natural gas and all other persons, firms or corporations interested, of any hearing or hearings which may be called for the purpose of establishing any facts upon which any proposed rule or regulation may be based."

"55-705a.  Certificate required; notice and hearing. Before any gas shall be produced from a well producing gas only, or from a well which is primarily a gas well, for any of the purposes specified in K.S.A. 55-702, a certificate shall be obtained from the commission for the construction of the facilities necessary or required and/or the utilization of the gas in the manner and for the purposes intended; and the commission shall issue such certificate unless it finds, upon application and after hearing, that the contemplated production or use of such gas is in violation of this act: *Provided, however,* That no such certificate shall be required on account of such facilities as were in existence or under construction, or such uses as were being made of such gas, on February 1, 1945."

"55-705b.  Application; notice. No allowable shall be granted by the commission for any gas well except upon application duly verified setting forth the location of the well and the description of the acreage attributable thereto, the common source of supply in which the same is located and such other information as the commission may require. Upon the filing of any such application the same shall be duly docketed and notice thereof given in the manner and for the time provided in K.S.A. 55-706."

"55-706.  Proceedings before commission upon petition; designation of certain officers or employees to conduct investigations and hearings; powers; findings and recommendations. (*a*) Proceedings may be instituted before the commission upon petition of any interested party, or by the attorney general on behalf of the state, or on the motion of the commission, upon any question relating to the enforcement of this act or the promulgation, revocation, amendment, renewal, interpretation, extension, or the enforcement of any rule, regulation or order, or the determination of any right thereunder, in the manner provided in K.S.A. 55-605, and that each and all of the provisions of said section as amended, shall apply to and govern such proceedings under this act.

"(*b*) The state corporation commission is hereby authorized to designate or appoint its director of petroleum conservation or its assistant director of petroleum conservation or one of its attorneys as an examiner or referee to make investigations and conduct hearings that are required of the commission by act of which this section is amendatory. Such investigations and hearings shall be made and conducted in the same manner as by the commission. Such examiners and referees shall have the power to administer oaths and to subpoena witnesses. The commission may provide for a record to be made of any hearing or investigation. Such examiners and referees shall submit their findings and recommendations in writing to the commission."

On March 19, 1962, the Commission issued the Revised Basic Proration Order for the Panoma Council Grove Gas Pool. This order provides, in relevant part:

"1.  The Panoma Council Grove Pool, the reservoir here under consideration, is made up of numerous interbedded limestone and shale members and lies within what is commonly referred to as the Council Grove Group of the lower

Permian system. Gas is generally encountered in the limestone members therein between depths of 2600 feet to 3000 feet below the earth's surface. . . .

. . . . .

"3. . . .

"In order to safeguard the correlative rights of landowners and operators in this pool and to prevent disproportionate production therefrom and in order to provide for orderly development of new wells, it is necessary, as contemplated by G.S. 1961 Supp. 55-703, for the Commission to take jurisdiction of this Pool and to prescribe rules and regulations for the drilling of wells and production of gas to the end that each person may take therefrom only such portion, of the amount that may be produced without waste, as will permit each developed lease to ultimately produce the volume of gas which underlies such lease.

"4. The exact geographical limits of the Panoma Council Grove Pool cannot be definitely established until much additional exploration and development has taken place. Nevertheless, the Commission has the statutory power and duty to assume jurisdiction over a common source of supply before such common source of supply has been fully developed, in order to insure that the development will be orderly. . . .

. . . . .

"5. One well completed in said formation can adequately and efficiently drain 640 acres without causing waste. In accordance therewith, the basic acreage unit to be used in the proration formula hereinafter prescribed shall be 640 acres.

. . . . .

"7. All acreage attributable to a well for allowable purposes must be situated within the governmental section in which the well itself is located or must be contiguous and adjoining and must form a common boundary, other than a point, with that acreage in the governmental section on which the well is located."

On September 5, 1962, the above order was amended to alter well spacing requirements and acreage attribution requirements. The amendments provided, in relevant part:

"To be considered as attributable to a well, the acreage shall be contiguous or adjoining, with the well located as nearly as practicable in the center thereof, and in no event nearer than 1,250 feet from any boundary line of the unit if a full 640 acres is to be attributed thereto. Any well drilled nearer than 1,250 feet to any unit boundary shall have its attributable acreage determined by establishing an acreage attribution unit with its width defined as being twice the distance from the well to the nearest unit boundary line, and the length not to exceed twice the width.

. . . . .

"Exceptions to the contiguous or adjoining acreage provisions may be granted whenever the Commission finds:
"C. 1. That the granting of such exception is necessary to prevent waste or to protect correlative rights; and
2. That a reasonable attempt has been made to include the acreage sought to be attributed in contiguous units; and
3. All acreage concerned is proven to be reasonably comparable in the Council Grove pay formation.

"All acreage attributed to a well must be proven to be productive of gas by competent evidence. Provided further the Commission may, either on complaint filed, or upon its own motion after notice and hearing, exclude any acreage from inclusion in the unit which in its judgment, based on such evidence, is not productive and should not be considered as proven acreage."

All parties agree that the Commission is without authority to order compulsory unitization under the provisions of Article 7 of Chapter 55 above cited. This is in accord with *Republic Natural Gas Co. v. Baker,* 197 F.2d 647 (10th Cir. 1952). Subsequent to the *Republic* case, the Kansas Unitization Act (K.S.A. 55-1301 *et seq.*) was enacted, which permits compulsory unitization under certain designated circumstances. The application before us was not filed pursuant to said act and neither the parties nor the Commission seek to make the application an Article 13 proceeding. This appeal involves the powers of the Commission under Article 7 of Chapter 55.

*Colorado Interstate Gas Co. v. State Corporation Comm.,* 192 Kan. 1, 386 P.2d 266 (1963), *cert. denied* 379 U.S. 131 (1964), contains an excellent discussion of the role of the Commission, including, *inter alia:*

"The administration of the law with respect to the production and conservation of natural gas is classified in that recognized area of regulation which necessitates the authority to exercise a considerable degree of discretion. The legislature delegated that authority to the Commission and with great latitude for the exercise of discretion through the promulgation of rules, regulations, orders, and decisions. In recognition of that authority, in providing for judicial review of the Commission's actions, it specifically limited the authority of the reviewing court by providing that:

" ' . . . The authority of the court shall be limited to a judgment either affirming or setting aside in whole or in part the rule, regulation, order or decision of the commission. . . .' (G.S. 1949, 55-606.)" p. 14.

"The Commission has three responsibilities under the Gas Conservation Statute. It must first of all prevent waste of the natural resource. It must allow sufficient production to meet the market demand if such can be done without waste. It must protect correlative rights.

"In a gas field such as the Kansas-Hugoton where five major companies are taking gas through separate pipelines not connected to the same wells, the responsibilities placed upon the Commission will clash. If the market demand cannot be supplied without waste, or if correlative rights cannot be protected without waste, or if correlative rights cannot be protected without unduly restricting production needed for the market demand, one of the three, waste, market demand, or correlative rights, must suffer. The dominate purpose of the Gas Conservation Statute is to prevent waste. (*Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 169 Kan. 722, 222 P.2d 704.)

"The Commission cannot require or guarantee that each well owner will produce and sell his entire allowable. The Commission is required to afford each owner the 'right or opportunity' to produce his share. As far as the Commission's duty under the basic order goes, it is fulfilled when each owner is legally 'free to produce' and not denied the 'right or opportunity' to produce his allowable.

"The Commission could not be required to shut in an entire gas field to protect correlative rights where some of the producers desired to cease production and hold a gas field for a reserve. The Commission could not be required to unduly restrict production in a gas field because some producers desired to deplete the gas at a very low rate regardless of the reason.

"When waste, market demand, and correlative rights are in conflict the Commission must determine which is to be given preference. If the decision of the Commission is supported by evidence, the courts cannot interfere." pp. 24-25.

Mobil's contentions may be summarized as follows:

1.  The inclusion of the 4/7 interest in the unit is not forced unitization of the 3/7 interest;

2.  By considering the possible effect of the inclusion of the 4/7 interest on the excluded 3/7 interest, the Commission was exceeding its jurisdiction and invading the province of the courts;

3.  The decision of the Commission is directly contrary to the theory upon which the Basic Proration Order for the Panoma Council Grove Gas Field, as amended, is premised; and

4.  The Commission's order results in the violation of the correlative rights of the 4/7 owners and constitutes waste.

The contentions of the intervenors on appeal may be summarized as follows:

1.  The Commission was correct in determining that it lacked jurisdiction to include 91 acres of the 160-acre tract in dispute in the proposed unit;

2.  K.S.A. 55-705b requires any application for an allowable to specify the "location of the well and the description of the acreage attributable thereto, the common source of supply . . . ." The acreage requirements in said statute refer to surface acres rather than mineral acres. Intervenors further contend this interpretation is necessary by virtue of the well spacing provisions;

3.  If the Commission had approved the application in toto, the result would be, for all practical purposes, a legal partition of the disputed tract; and

4.  The Commission properly considered the possible effect of its order in determining it lacked jurisdiction over the 4/7 undivided interest.

The contentions of the Commission are expressed in previously quoted sections from its orders and brief.

At first blush the Commission's order appears to be a rather logical determination. On closer scrutiny, however, serious questions are raised as to its propriety. We note the following:

1. The application was for assignment of an allowable at an appropriate time and for a noncontiguous acreage attribution exception. Interestingly, the objections to the proposed unit are wholly unrelated to the fact the proposed unit is noncontiguous. Likewise, there is no complaint that the proposed allowable would be unfair. Mobil was not seeking a full 640-acre allowable on a 571-acre unit. The allowable would be based on the actual size of the unit. This would, theoretically at least, leave the intervenors' 3/7 interests in 160 acres in the Panoma Council Grove Gas Field undisturbed.

2. The whole theory of gas production involves a number of fictions which were created out of necessity. The Panoma Council Grove Gas Field is a vast pool, the exact perimeters of which are unknown. Unlike solid minerals, gas moves. What underlies one tract moves to other tracts and of course may be withdrawn by wells on other tracts. The Commission has determined that one well can drain 640 acres. Through elaborate regulations some order is sought to be made out of what could be a highly chaotic situation. These regulations are aimed at preventing waste and the unfair or inequitable taking of gas from the pool. See *Bennett v. Corporation Commission,* 157 Kan. 589.

3. The intervenors contend they own an undivided interest in every molecule of gas under the entire 160-acre tract, and therefore the Commission does not have jurisdiction over any of the tract absent consent of all owners of the mineral interest. There is a producing well, owned by Anadarko and located on the quarter section immediately west of the disputed tract, which presumably is draining the disputed tract. The revised proration order concludes one well will drain 640 acres. There is no evidence as to whether or not the proposed well (G. W. Shell Unit No. 1), from its location on Section 29, will be draining gas from under the disputed tract, notwithstanding the Commission's statements inferring that it would be draining the disputed tract.

4. Under the common law rule of waste, a cotenant could not remove minerals from land concurrently owned without the con-

sent of the concurrent landowner. However, Kansas has joined the present majority view that a concurrent owner has the power to separately lease and develop his own interest. 2 Williams and Meyers, Oil and Gas Law § 502 (1977); see *Compton v. Gas Co.,* 75 Kan. 572, 89 Pac. 1039 (1907), and see generally 91 A.L.R. 205, 40 A.L.R. 1400.

5. The inclusion of the 4/7 interest would not be a bar to any action the owners of the 3/7 interest might bring against Mobil for failure to develop the lease under its implied covenants. In *Rush v. King Oil Co.,* 220 Kan. 616, 627, 556 P.2d 431 (1976), this court stated:

"The purpose of the statute (K.S.A. 55-601, *et seq.*) is not to give the corporation commission the power to regulate development but rather to prevent waste and the unfair or inequitable taking of oil from any pool. (*Bennett v. Corporation Commission,* 157 Kan. 589, 142 P.2d 810, 150 A.L.R. 1140; *Aylward Production Corp. v. Corporation Commission,* 162 Kan. 428, 176 P.2d 861.) The orders of the commission in this regard do not preclude judicial review of a claim based on a breach of the implied covenants in an oil and gas lease."

See also *Renner v. Monsanto Chemical Co.,* 187 Kan. 158, 170, 354 P.2d 326 (1960), wherein this court considered the defendant's assertion that valid orders of the State Corporation Commission issued pursuant to G.S. 1949, 55-601 *et seq.,* afforded an impregnable defense to suits in the courts to enforce the obligation of further development under the implied covenants of an oil and gas lease. In rejecting the claimed defense, this court stated:

"The question has not previously been passed upon by this court and requires a consideration of our oil conservation statute (G.S. 1949, 55-601 *et seq.,* as amended) and its effect on implied covenants of an oil and gas lease. As the issue is here presented, we are not concerned with whether a prudent operator would have drilled additional wells to fully develop the premises or to protect it against drainage since those questions were determined adversely to the defendants and the evidence more than amply supported the findings. The narrow question is whether, as a matter of law, the commission's order attributing the full acreage of the leasehold to each producing well in 20-acre tracts constitutes a finding that the Renner wells would adequately and effectively extract the oil underlying the specific acreage attributed to each, thus relieving the defendants of their duty to further protect the premises against drainage, and precludes the district court from inquiring into the alleged violation of that implied covenant. We are not persuaded. A detailed analysis of the statute is unnecessary since that was done in *Aylward Production Corp. v. Corporation Commission,* 162 Kan. 428, 176 P.2d 861. Suffice it to say it was enacted to prevent physical or economic waste; to protect correlative rights of producers; to assure ratable taking within a common pool; to prevent discrimination among pools, and the legal device selected to accomplish those purposes is 'proration.' "

6.   The application does not seek an order from the Commission including a nonconsenting owner in the unit. That would be attempted forced unitization. Owners of the 3/7 interest have convinced the Commission to exclude the consenting owners of the 4/7 interest from the unit in the name of protecting the 3/7. Nowhere in statutes, regulations, or case law are "bargaining rights" a matter that the Commission is intended to regulate, supervise, or protect. To protect the bargaining rights of the 3/7, the right to produce is being denied the 4/7. Let us assume the 4/7 successfully proceeded with a partition action and, so partitioned, again sought to join the unit. The "bargaining rights" of the 3/7 would be allegedly jeopardized in precisely the same manner. The rather dog-in-the-manger position of the owners of the 3/7 interest is that if Mobil won't pay them a premium for joining the unit then it is unfair to let the owners of the 4/7 interest into the unit. The Commission, by its order, permits the 3/7 to use the 4/7 as a tool to improve their bargaining position. The Commission is acting upon what might be referred to as equitable considerations when it is cloaked with no equitable jurisdiction.

We must conclude that the Commission erred in determining it did not have jurisdiction to consider the inclusion of the 4/7 interest on its merits.

The judgment of the district court is reversed and the matter is remanded to the State Corporation Commission for consideration on the merits.

SCHROEDER, C.J., dissenting: I must respectfully dissent from the majority opinion for the reasons hereafter stated and upon the philosophy expressed in my dissent to *Williams v. City of Wichita,* 190 Kan. 317, 341, 374 P.2d 578 (1962). The Supreme Court today authorizes the State Corporation Commission (Commission) to exercise jurisdiction under the Gas Conservation Act, K.S.A. 55-701 *et seq.,* which confers no statutory authority, to compel the owners of an undivided mineral interest to join in unit operation of an oil and gas lease.

Nowhere in the majority opinion are we told the legal basis upon which the Commission exercises jurisdiction over the undivided mineral interests spawning this suit. The majority pro-

vides an exhaustive statement of the facts and expounds the legal positions taken by the parties to this dispute. However, the six paragraphs concluding the majority opinion give no satisfactory reason for remanding the case to the Commission. I find particularly objectionable the sixth and final paragraph which attempts to denigrate valid property rights and contract rights of the parties herein by calling them "bargaining rights," which the owners defend by a "dog-in-the-manger position."

In an effort to avoid as much confusion as possible, the facts in the majority opinion will be relied upon as a background for this dissent. However, the following facts require emphasis:

Mobil Oil possesses leases on the oil and gas development rights for the four 160-acre tracts included in the application for a noncontiguous acreage attribution exception. *None of the leases contain a unitization or entirety clause,* which allows easy attribution for production units. Mobil successfully negotiated *new agreements* with the owners of three tracts and 4/7 of the royalty interest owners of the disputed quarter section tract. The new agreements permit unitization of the leaseholds into one production unit. Gas produced from one well will be considered gas produced proportionately from each tract in the unit. The 3/7 interest *owners in the disputed 160-acre tract* negotiated with Mobil Oil, but could not reach an agreement *modifying* the *existing lease.*

At this point, a summary of relevant Kansas law on oil and gas rights and property rights of tenants in common is crucial. Kansas landowners own a present estate in the oil and gas in the ground. See *Richards v. Shearer,* 145 Kan. 88, 64 P.2d 56 (1937). This is the "ownership in place theory." The nature of the landowner's interest in oil and gas is the same as his interest in solid minerals. 1 Williams and Meyers, Oil and Gas Law §§ 203, 203.3. In *Stratmann v. Stratmann,* 204 Kan. 658, 662, 465 P.2d 938 (1970), we defined the terms "royalty interest" and "mineral interest," stating:

"The term 'royalty interest' generally refers to a right to share in the production of oil and gas at severance. It is personal property and concerns the proceeds from oil and gas leases if and when there is production.

"The term 'mineral interest' as commonly used refers to the oil and gas in place and constitutes a present ownership of an interest in real property. (*Shepard, Executrix v. John Hancock Mutual Life Ins. Co.,* 189 Kan. 125, 368 P.2d 19.) A prime characteristic of a mineral interest is the right to enter the land to produce

and carry on production activities. This right may be leased to others. (Williams and Meyers, Oil and Gas Law, Manual of Terms, p. 232.)"

The mineral interest owners of the disputed 160-acre tract (Tract IV) are tenants in common; each owns an undivided fractional share of the gas beneath the tract. See *Stratmann v. Stratmann,* 204 Kan. at 664; *Holland v. Shaffer,* 162 Kan. 474, 479, 178 P.2d 235 (1947). As tenants in common each must have the right to occupy the whole in common with the cotenants. *Fry v. Dewees,* 151 Kan. 488, Syl. ¶ 2, 99 P.2d 844 (1940).

The common law rule of waste prohibited a cotenant from removing minerals from the land without the concurrent land-owner's consent. Following the present majority rule, Kansas permits a cotenant to produce oil or gas without joining other cotenants. See 2 Williams and Meyers, Oil and Gas Law § 502; see also *Compton v. Gas Co.,* 75 Kan. 572, 89 Pac. 1039 (1907). However, the cotenant's right to separately lease and develop his interest is accompanied by a duty to account to the other coten-ants. A cotenant separately exploring and developing oil and gas must bear all the risk and expense of development. If production results, the developing cotenant may recover expenses out of the proceeds of production. After the well pays out, the proceeds of production must be shared proportionately with other cotenants. See *Prewett v. Van Pelt,* 118 Kan. 571, 235 Pac. 1059 (1925); *Johnson v. Gas Co.,* 90 Kan. 565, 135 Pac. 589 (1913); 2 Williams and Meyers, Oil and Gas Law § 504.1; see also Annot., 5 A.L.R.2d 1368, 1380.

According to the "rule of capture," the owner of land and those leasing from him own all the oil and gas produced from wells located on the land. *Carlock v. Krug,* 151 Kan. 407, 411, 99 P.2d 858 (1940). When several tracts of land are unitized or pooled, gas production from a well on any tract is considered produced proportionately from each tract in the unit. Pooling or unitization agreements in leases permit gas production without drilling a well on each and every tract of land in the unit.

The Commission has the authority to *encourage* pooling or unitization to prevent waste and protect correlative rights. 6 Williams and Meyers, Oil and Gas Law § 933.4. However, the Commission's authority to *compel* unitization is governed strictly by statute. K.S.A. 55-1301 *et seq.; Republic Natural Gas Co. v. Baker,* 197 F.2d 647 (10th Cir. 1952). The Kansas Unitization Act

permits unitization and unit operation of a gas pool or part of a gas pool if certain field conditions are met (55-1304), *and the unit plan is approved by 75% of the working interests and royalty owners.* (55-1305.) *After notice and hearing,* if the unit application complies with all statutory requirements, the Commission may order unit operation. (55-1304.) The Act authorizes the Commission to compel unitization on the nonsigning 25% royalty owners. In pertinent part, K.S.A. 55-1308 provides:

"*Property rights, leases, contracts,* and other rights or obligations *shall be regarded as amended and modified only to the extent necessary to conform to the provisions and requirements of this act and to any valid order of the commission providing for the unit operation of a pool or a part thereof, but otherwise shall remain in full force and effect.*" (Emphasis added.)

All parties have stated that the Commission has no jurisdiction to compel unitization, citing *Republic Natural Gas Co. v. Baker,* 197 F.2d at 650. It must be conceded *Republic* stated compulsory unitization is not possible without statutory authority. It must be noted, however, the Kansas Unitization Act (K.S.A. 55-1301 *et seq.*) was adopted in 1967 subsequent to the *Republic* decision, yet none of the parties to this dispute attempt to differentiate between the Gas Conservation Act (K.S.A. 55-701 *et seq.*) and the Unitization Act, which permits the issuance of a unitization order only upon the application of a working interest owner. K.S.A. 55-1303; 16 Kan. L. Rev. 567. The court is not concerned with the provisions of the Unitization Act in this action. *The provisions of the Unitization Act have not been invoked.*

The jurisdiction of the Commission herein was invoked by an application for the assignment of an allowable and for a noncontiguous acreage attribution exception for a well to be drilled in the Panoma Council Grove Gas Field, Stevens County, Kansas. It requested an exception from the noncontiguous acreage attribution restrictions of the Basic Proration Order applicable to that field. The Commission responded precisely as it should have under the Gas Conservation Act.

The Kansas Unitization Act is important to a resolution of this case. The Act evinces a legislative intent to permit compulsory unitization under statutorily controlled circumstances. The Act specifically authorizes the Commission to modify property, lease, and contract rights in favor of unit operation of gas pools. In contrast, the Gas Conservation Act, 55-701 *et seq.,* does not

specifically authorize the Commission to modify property or contract rights. This contrast looms significant when we recall our decision in *Bennett v. Corporation Commission,* 157 Kan. 589, 596, 142 P.2d 810 (1943), where we stated, "The commission has a limited jurisdiction. It possesses no powers not given it by the statute." K.S.A. 55-1314 states that the Unitization Act shall be supplemental to and part of the Oil and Gas Conservation Acts, K.S.A. 55-601 *et seq.,* and 55-701 *et seq.*

In my opinion, the conclusion to be drawn is that the Kansas legislature granted the Commission *new* powers in the Unitization Act. Those powers were made a part of the existing Conservation Acts. It is logical to assume those powers did not previously exist. Specifically, Commission authority to modify property, contract, and lease rights to accomplish unit operation of gas pools did not exist until 55-1308 was adopted. K.S.A. 55-1308 permits Commission modification of those rights only in conjunction with *statutorily limited compulsory unitization.*

The following summary will focus attention on the specific issues in dispute:

1. By a lease with the 3/7 interest owners of Tract IV Mobil is obligated to develop, drill and produce gas pursuant to the rule of capture. All proceeds from gas produced from a well on Tract IV are accountable to only Mobil and the Tract IV owners.

2. Mobil seeks to produce gas from a gas pool in the most cost efficient and least wasteful manner. An attempt to accomplish this by forming a *voluntary* unit operation *failed.*

3. For unstated reasons, compulsory unitization, pursuant to K.S.A. 55-1301 *et seq.,* has not been accomplished.

4. Mobil filed an application with the Commission under K.S.A. 55-701 *et seq.,* and the Revised Basic Proration Order for the Panoma Council Grove Gas Pool. The Commission must grant permission before new gas wells may be drilled in the Panoma Council Grove Gas Pool. An exception is required before noncontiguous acreage attribution to an allowable is permitted. The basic acreage unit for an allowable is 640 acres.

5. The Commission reviewed the Mobil application and granted an allowable and a noncontiguous acreage attribution exception on *three* tracts. The Commission order stated in pertinent part:

"The Commission is able to regulate only in a manner prescribed by this state's legislature. The statutory directives in Article 7 of the Kansas Statutes Annotated are primarily aimed at preventing waste and protecting the correlative rights of those with interests in the production of natural gas in the state. *At no point in the gas conservation statutes is the Commission able to require the compulsory formation of a production unit without the consent of those with interests in the royalties.* Even though the formation of a production unit of separate tracts in the Panoma Council Grove Field may be desirable for the prevention of waste and the protection of correlative rights, *the authority to require it may not be implied from the gas conservation statutes.* As a result, the Commission is without jurisdiction to approve the attribution of an undivided 4/7 interest of the Northeast Quarter (NE/4) of Section 31, to the G. W. Shell No. 1 Well.

"It is clear that the Applicant would not be able to produce gas from only 4/7 of that acreage. Rather, the Applicant would be taking gas from the entire quarter section. *Thus, attributing the undivided 4/7 interest would either have an effect similar to a partitioning of the interests in this property, or violate the rights of those with the remaining undivided 3/7 interests in the quarter section,* and thus possibly compel them to join in the unit. The Commission is unable to bring about either of these results." (Emphasis added.)

## 6. This lawsuit challenges those Commission findings.

In my opinion the Commission and the trial court were eminently correct.

This court gives great weight to the Commission's factual determinations and the interpretation of its own rules and regulations. In *Colorado Interstate Gas Co. v. State Corporation Comm.,* 192 Kan. 1, 18, 386 P.2d 266 (1963), *cert. denied* 379 U.S. 131 (1964), we stated:

"It may be stated as a general proposition of law that the determination of market demand and establishing allowables is a responsibility which the legislature has lodged in the Commission. The courts are without jurisdiction to determine the method the Commission should use or the factors which it should consider. *The courts may examine the methods used for the purpose of determining whether the Commission has acted within the power and authority delegated to it by the legislature.*

"In considering the validity of the Commission's determination, the *courts can consider only the statutes granting the Commission's authority and the Commission's basic order with such amendments as are properly made thereto.* The determination is a question of fact. What facts are to be considered and the relative weight to be accorded them are matters left to the Commission's discretion. Unless the determination is arbitrarily or capriciously made without supporting evidence, the courts cannot interfere and substitute their judgment for that of the Commission. The question for the reviewing court is the power of the Commission to make the order, not its wisdom, propriety or expediency in having made it. (*Interstate Comm. Comm. v. Ill. Cent. R.R.,* 215 U.S. 452, 54 L.Ed. 280, 30 S.Ct.

155.) In *City of McPherson v. State Corporation Commission,* 174 Kan. 407, 257 P.2d 123, in considering the authority of the reviewing court under a similar statute, this court said:

" '. . . Its function was to consider what the Commission had considered, not to inject its own views into what should have been considered by the Commission. The court had no authority under the statute to review the work of the Commission except in the manner and to the extent the statute gave it such authority. . . .' " (p. 414.) (Emphasis added.)

See *Columbian Fuel Corp. v. Panhandle Eastern Pipe Line Co.,* 176 Kan. 433, 440, 271 P.2d 773 (1954).

We also discussed the Commission's responsibility under the Gas Conservation Act in *Colorado Interstate Gas Co. v. State Corporation Comm.,* 192 Kan. at 24-25, stating:

"The Commission has three responsibilities under the Gas Conservation Statute. It must first of all prevent waste of the natural resource. It must allow sufficient production to meet the market demand if such can be done without waste. It must protect correlative rights.

"In a gas field such as the Kansas-Hugoton where five major companies are taking gas through separate pipelines not connected to the same wells, the responsibilities placed upon the Commission will clash. If the market demand cannot be supplied without waste, or if correlative rights cannot be protected without waste, or if correlative rights cannot be protected without unduly restricting production needed for the market demand, one of the three, waste, market demand, or correlative rights, must suffer. The dominate purpose of the Gas Conservation Statute is to prevent waste. (*Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 169 Kan. 722, 222 P.2d 704.)

"The Commission cannot require or guarantee that each well owner will produce and sell his entire allowable. The Commission is required to afford each owner the 'right or opportunity' to produce his share. As far as the Commission's duty under the basic order goes, it is fulfilled when each owner is legally 'free to produce' and not denied the 'right or opportunity' to produce his allowable.

"The Commission could not be required to shut in an entire gas field to protect correlative rights where some of the producers desired to cease production and hold a gas field for a reserve. The Commission could not be required to unduly restrict production in a gas field because some producers desired to deplete the gas at a very low rate regardless of the reason.

"When waste, market demand, and correlative rights are in conflict the Commission must determine which is to be given preference. If the decision of the Commission is supported by evidence, the courts cannot interfere."

After reviewing the record on appeal, considering all the arguments of the parties, and analyzing the applicable legal principles, this court should uphold the Commission order and affirm the trial court. There is sufficient evidence to support the Commission's factual findings, and the Commission properly interpreted its rules and regulations to exclude jurisdiction over the undivided royalty interests in Tract IV.

Both geological and legal theory support the Commission's factual statement that Mobil could not produce gas from only the 4/7 interest in Tract IV, and that Mobil would be taking gas from the entire quarter section. Each of the seven cotenants owns an undivided share of all the gas beneath Tract IV. The gas cannot be physically apportioned into seven shares. Gas is fugacious; it does not obey man-made boundaries. The concept of unit operation of gas production is the result of that reality. Indeed, the gas is described as being in "pools," and the Commission has determined one well may adequately drain 640 acres. See *Somers v. Harris Trust & Savings Bank,* 1 Kan. App. 2d 397, 400, 566 P.2d 775 (1977); and Revised Basic Proration Order for the Panoma Council Grove Gas Pool; see generally *Smith v. Home Royalty Association, Inc.,* 209 Kan. 609, 498 P.2d 98 (1972); *Johnson v. Gas Co.,* 90 Kan. 565, 573, 135 Pac. 589 (1913).

Mobil's expert witness, L. C. Case, an engineering specialist, provided evidentiary support for the Commission's finding that attribution of the 4/7 undivided interest to the allowable could compel the 3/7 undivided interests to join the unit operation. On cross-examination of L. C. Case by Dale M. Stucky, the following information was elicited:

"Q. You say if the Brecheisens don't sign this agreement there is no way that they can get production? Is that what you are saying?

"A. No, sir. I'm saying that the people who did sign would have no way to get production in the Northeast Quarter of 31 if we are not permitted to attribute that portion of the undivided interests who did sign.

"Q. Why is that?

"A. Nobody is going to go in and drill a well on a 3/7 interest and with 4/7 interest outstanding. That would be my opinion.

"Q. Nobody is going to drill a well on what?

"A. A 3/7 interest.

"Q. You mean on the 3/7 interest that the Brecheisens own? Is that what you are saying?

"A. Yes.

"Q. So what you are saying is that the effect of this Commission's order would be to compel my client to come in on this unit because nobody would drill a well after the Commission granted an allowable on 3/7 interest, including Mobil; is that correct?

"A. Not so long as Mobil still has the leasehold on that 3/7 interest, they wouldn't come in and drill.

"Q. In other words, so long as Mobil hangs on to that leasehold and 3/7 interest, they are just out of luck if the Commission grants this allowable and they don't join the unit?

"A. That would be true, yes.

"Q. And Mobil isn't about to give up this voluntarily?

"A. Not that I am aware of.

"Q. I see. So this is kind of an 'either-or' proposition, as far as you are concerned? Either they get into this unit or they never have any production?

"A. As things would stand at this time, yes.

. . . . .

"Q. So now you are proposing that this Commission enter an order that you say will make it impossible for you to develop their acreage under their lease as it now exists?

"A. No, sir, it won't make it impossible.

"Q. Improbable?

"A. No. The unit agreement as proposed is open-ended. They can join our unit at any time they wish.

"Q. But if the Commission grants the order, you say there will just be a 3/7 left, and there is no way that this lease could be developed other than their coming in and knuckling under to Mobil? That is what you testified, wasn't it?

"A. The only way, in my opinion, that their interest could be developed, if they don't choose to join the unit, is for them to in some way acquire their interest in the Council Grove that is attributed to some other well.

"Q. You mean they would have to come to Mobil and ask them to give the lease back, or something? Is that what you are saying?

"A. That is the only way I can see how they could put this acreage into production if—

"Q. If the Commission grants the allowable you ask?

"A. Right.

"Q. And you said Mobil isn't about to release that?

"A. I am not aware that we have any plans such as that at this time."

There is also support for the Commission's decision it lacked jurisdiction to partition the interests in Tract IV. Mobil wanted the Commission to attribute the consenting 4/7 undivided interest in Tract IV. The well would then be drilled on one of the other tracts, and the 4/7 interest cotenants would circumvent their legal duty to account to the 3/7 interest cotenants. See 1 Meyers, The Law of Pooling and Unitization § 14.04, p. 506 (2d ed. 1967). *When cotenants disagree as to proper use and development of the minerals under the land the remedy is to partition their interests.* If partition is not accomplished by voluntary contractual agreement the cotenants may petition the district court for partition. See *Miller v. Miller,* 222 Kan. 317, 320, 564 P.2d 524 (1977); *Kuhn v. Kuhn,* 112 Kan. 155, 210 Pac. 343 (1922); see also 59 Am. Jur. 2d, Partition §§ 1, 30. Partition of oil and gas interests is a matter expressly within the jurisdiction of the district courts. K.S.A. 60-1003; see *Home-Stake Production Co. v. Tri-State Pipe Co.,* 197 Kan. 163, Syl. ¶ 1, 415 P.2d 377 (1966); *Strait v. Fuller,* 184

Kan. 120, 334 P.2d 385 (1959); *Gillet v. Powell,* 174 Kan. 88, 254 P.2d 258 (1953); *Holland v. Shaffer,* 162 Kan. 474, 178 P.2d 235 (1947). As the earlier discussion of the Kansas Unitization Act explained, the Commission has very limited powers to modify property, lease and' contract rights. (K.S.A. 55-1308.)

Writing in dissent to *Bennett v. Corporation Commission,* 157 Kan. at 598, former Justice Parker (later Chief Justice) stated:

"Because a statute is constitutional—and I concede the oil proration statute is—it does not follow that all orders made under it are valid. A statute may be absolutely unassailable on constitutional questions and yet a board or commission charged with the duty of enforcing its provisions may so interpret its force and effect and apply it to a particular situation as to deprive an individual of rights guaranteed to him by the constitution. The commission's authority is limited by the language of the statute under which it derives its power and if it attempts to proceed beyond the scope of that grant the court should refuse to sustain its action."

Finally, a few comments are in order regarding the matters "noted" at the end of the majority opinion. Note 1 states that "theoretically at least" the grant of an allowable on the requested 571 acre unit would not disturb the 3/7 interests in Tract IV. That statement is superfluous and deceptive. Hopefully this dissent has demonstrated that *factually* and *legally* the grant of the requested allowable would disturb the 3/7 interest in Tract IV.

Note 3 abandons this court's standards of review for Commission decisions and substitutes unsupported factual statements for the original factual findings of the Commission.

Note 4 only half explains the cotenants' right to separately develop mineral interests. No mention is made of the cotenant's duty to account to other cotenants when gas is produced from the tract.

Note 5 is interesting, but misses the point. The Commission lacks jurisdiction to issue an order attributing undivided interests in a tract of land to an allowable for a gas well.

The first two sentences of note 6 ignore the testimony of Mobil's engineering specialist, Mr. L. C. Case. Mobil is obviously attempting to force the 3/7 interest into the unit. In addition, more than "bargaining rights" are involved. Valid contract rights are at stake; specifically, the lease between Mobil and the 3/7 interest owners. Legitimate property rights are also at stake; specifically, the 3/7 undivided royalty interest. The majority would be wise to reconsider the concluding words in *Republic*

*Natural Gas Co. v. Baker,* 197 F.2d at 650: "The law does not imply a power in the regulatory bodies or the courts to take the property of one party and give it to another in order to effectuate a just result."

It is respectfully submitted the judgment of the lower court should be affirmed.

PRAGER and HERD, JJ., join the foregoing dissenting opinion.